Filed 10/21/22  P. v. Noel CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Modoc)

----

| | |
|---|---|
| THE PEOPLE, | C089559 |
| Plaintiff and Respondent, | (Super. Ct. No. F18084) |
| v. | |
| ARTHUR JOSEPH NOEL, | |
| Defendant and Appellant. | |

SUMMARY OF THE APPEAL

A jury found defendant Arthur Joseph Noel guilty of multiple sex offenses against his daughter, R., over the course of two years, when she was between the ages of six and seven.  The jury found defendant guilty of one count of a lewd act upon a child (Pen. Code, § 288, subd. (a); count one; unspecified statutory section citations that follow are to the Penal Code), one count of sexual intercourse with child aged 10 or younger (§ 288.7, subd. (a); count two), three counts of oral copulation with a child aged 10 or younger (§ 288.7, subd. (b); counts three, four, and six), and one count of sodomy with a

1

child aged 10 or younger (§ 288.7, subd. (a); count five). The jury also found defendant guilty of making a criminal threat to R. (§ 422, subd. (a); count seven). The trial court sentenced defendant to an aggregate determinate term of eight years eight months for counts one and seven, which included an eight-year upper term on count one. The trial court also sentenced defendant to an aggregate indeterminate term of 95 years to life in prison for counts two through six. Defendant timely appealed.

On appeal, defendant argues the trial court violated his rights under the Sixth and Fourteenth Amendments of the U.S. Constitution in three ways. First, he argues that the trial court erred in admitting expert witness testimony regarding child sexual abuse accommodation syndrome (CSAAS), which he characterizes as "junk science" that has a higher prejudicial than probative value. Second, he argues that CSAAS evidence was not a proper subject for expert opinion under Evidence Code section 801. Third, defendant argues the trial court violated his constitutional rights by instructing the jury with CALCRIM No. 1193, the standard jury instruction regarding the use of CSAAS evidence.

After the trial court entered its judgment and while this appeal was still pending, the Legislature amended sections 1170 and 1170.1. Defendant submitted a supplemental opening brief in which he argues the amended section 1170 limits a trial court's discretion to impose an upper term sentence, that the amended statutes apply to the sentence imposed on him under count one, and that we should vacate the trial court's sentence on count one and remand the matter to allow the trial court to apply the amended law in issuing a new sentence on count one. The People agree that defendant is entitled to be sentenced under the amended statute and that remand is required.

We remand for resentencing and otherwise affirm the judgment.

*The People's Case*

The following is a summary of testimony and evidence presented by the People, with the exception of the testimony of the CSAAS expert, Dr. Blake Carmichael. Because the admission of CSAAS evidence is central to issues defendant raised on appeal, we will set forth a summary of Dr. Carmichael's testimony in a separate section that also outlines the parties' motions and the trial court's rulings regarding that testimony.

*Report and Investigation*

Angelena Meier is a speech language pathologist intern who provides speech therapy to R. On February 6, 2018, when R. was seven years old, Meier made a report of suspected child abuse of R. She made the report after R. came in for therapy and was acting in a strange way. R. said defendant was going to kill her mother, K., which would mean R. would have to live with defendant, which R. said would be a really bad thing. During their conversation, R. also told Meier defendant frequently would force K. to orally copulate him, and R. provided details about how one would suck a man's penis which Meier saw as a red flag.

Luke Hughes, a social worker for the Modoc County Department of Social Services received the report. He spoke with R. and R. told Hughes defendant had threatened to kill her mother and their dog, and that defendant had thrown the dog. During the interview, R. told Hughes that defendant had touched her "P" and caused a bruise. Pursuant to department protocol, Hughes stopped the interview to allow for the department's sexual response team protocol to be followed, which requires a forensic interview with the child.

Erica Tassone, a social worker for the Modoc County Department of Social Services, who was qualified as an expert in child forensic interviews at trial, conducted

the forensic interview with R. over the course of two days, beginning on February 7, 2018. The interviews were recorded and played for the jury, and the jury was given a transcript of the interviews.

During the first day of interviews, R. described defendant touching her "pee" when she was six, seven, and five. R. said defendant had touched her pee more than once. R. said defendant had touched her pee while rubbing his own penis. R. said once when they were "sleeping," defendant put his penis in her butt. R. also described defendant putting his penis in her pee.

R. said at some point she told her mom her dad touched her. R. said the first time her dad touched her pee was November 26 when she was six. R. said defendant kicked her in the pee. He then made her hump and kiss him. R. said defendant touched her with his penis and he touched her pee with his hand. R. described defendant putting his penis in her mouth. R. said she once told K. defendant touched her pee, but K. did not understand. R. said another time she told K., and K. said it was okay, she was there, and defendant would not touch R. again. R. said her mom walked in when her dad put his penis in her mouth. R. said one time her mom called 911 and her dad got arrested.

During the second day of the interviews, at first R. said K. did not know anything about the abuse except that R. got a bruise on her pee at one point, but then R. said she told K. that defendant had touched her pee. R. told the story again of when K. walked in when defendant had his penis in R.'s mouth, and then K. called the cops. R. said when the cops arrived, defendant was crying and called K. evil. R. said her dad humped her when she was six and K. did not know.

Tassone had R. draw pictures depicting the abuse. R. drew a picture of her and defendant lying in bed with defendant's penis going in her mouth and K. walking in. She said K. then called 911. In a second drawing, defendant put his penis in R.'s butt. R. said that afterwards she went to her grandmother's house and called 911. R. said her butt felt bad the next time she tried to go to the bathroom.

4

R. said she had K. look at her butt, and K. said something about defendant putting his penis in R.'s butt. R. then talked about defendant putting his penis in her pee and K. calling 911. When Tassone asked R. about defendant putting his penis in her pee, R. responded that she had been lying down and defendant was kissing and licking her pee while she tried to get away. Defendant then put his penis in her pee and moved up and down.

R. said that when she had the bruise on her pee, she told K. it was probably from defendant. R. said her mom then called 911 like she always does.

R. said her dad told her if she told anyone about him touching her pee, he would kill her mother.

### *K.'s Testimony*

Defendant and K. married in the spring of 2010. R. was born that fall. K. and defendant divorced in 2015. From November 2016 through October 2017, K. and R. would sometimes stay with defendant. According to an agreement reached between defendant and K. in September 2017, defendant was supposed to have visitations with R. one weekday and one weekend day each week.

K. described a few instances where defendant's interactions with R. might have been suspicious.

K. recalled a time in June 2017 when she left R. with defendant at his place. When K. returned, she heard what sounded like R. making muffled cries. She found defendant and R. in his bedroom. R. was lying on her back on the bed with her feet in the air, and defendant was standing at the end of the bed, holding R.'s feet in his hands. R. was wearing just a t-shirt and defendant was wearing boxer shorts. Defendant shut the door, but K. pushed it back open, grabbed R. and left.

Another time in late June 2017, R. was staying the night with defendant. K. found defendant and R. naked in bed together.

5

K. recalled another time when defendant and R. were watching a movie together, and R. was wearing a t-shirt and underwear and sitting on defendant's lap. Defendant had his hand on R.'s thigh.

In December 2017, K. saw a bruise near R.'s clitoris that looked like a thumb print. It was dark purple. K. took R. to the doctor, who looked at the bruise—which was very light by the time the doctor examined it—and the doctor said everything was okay. K. also recalled that at some point R. complained about her butt hurting when she went to the bathroom.

K. testified that during the investigation, she told a deputy sheriff she had no knowledge of any sexual abuse between defendant and R. K. testified that, at the time, she believed it was true that there was no sexual abuse, because she did not think defendant was capable of doing that sort of thing to R. K. also admitted while testifying that when a social worker asked K. about the incidents, she told the social worker she had not been more forthcoming because she was afraid defendant would kill her.

K. testified that when R. was supposed to go stay with defendant, R. would complain about it. R. would say defendant made her uncomfortable and was mean—that he yelled a lot and threw things. R. would complain about having to sleep in the same bed as defendant. Because R. complained, K. asked defendant to stay on her couch instead, and he started doing that in about December 2017.

K. testified that R. did not tell K. about the sexual abuse.

### *R.'s Testimony*

R. testified from a remote location using closed circuit TV. She testified defendant was in jail because he had sex with her. R. said defendant put his private parts inside her private parts, including her "pee." She said that happened more than one time. The first time it happened she was five or six and at defendant's home. She was lying

6

down on the bed in her mom's room. She was lying under him and he was going up and down.

She testified about another time when he humped her on the couch when he had his clothes on, and her pants were pulled down but her underwear stayed on. She testified that when she was seven and in her room at K.'s apartment defendant put his penis in her butt. R. testified defendant put his penis in her butt one other time, on a different day, while her mom was at the store. R. denied her father ever did anything else with her privates or making her touch any part of his body with her mouth. R. recalled speaking with Tassone and drawing pictures. R. acknowledged that in one drawing defendant put his penis in her mouth. R. said defendant made her lick his penis while in the living room at his trailer. In another picture, R. drew defendant putting his penis in her butt. In a third, she drew his penis going in her pee. Defendant told her not to tell anyone about him putting his penis in her pee. She thinks she was seven the last time defendant touched her pee. She said she was maybe three or four when her father started putting his penis in her butt. She testified she drew pictures of things that actually happened.

R. testified that the bruise she had on her pee happened after a cousin kicked her and after defendant pushed too hard when he put his penis in her pee.

### *Defense Case*

The defense called Deputy Sherriff Eric VonRader, who testified that during the course of his investigation he checked department records to see if there were any complaints—e.g., records of 911 calls—prior to February 6, 2018, about defendant's behavior with R., and he found none.

Defendant also called various friends and acquaintances to attest to his character and to describe his relationship with R. and K.

7

Paul R. testified he has known defendant since 2008. Defendant has performed odd jobs for him, from construction to auto work. Paul R. testified he and his fiancée have also socialized with defendant, K., and R. together. He said all the interactions he has seen between defendant and R.—of which he estimates there have been about 10— were normal with nothing out of the ordinary. He has seen R. hug defendant and jump in his arms, calling him "Daddy." He has seen defendant and R. play and joke around together. Paul R. testified that R. never seemed reluctant to be around defendant. He testified R. never seemed afraid of defendant or talked about him doing bad things to her. He said he would trust defendant with his own children.

Paul R. testified about a time he and his fiancée saw R. in a parking lot, and he asked how she was doing. R. started telling them "Daddy does this" and making gestures, and saying things that were "very abnormal." Paul R. characterized R.'s statements as "odd," "out of the blue," and "blunt . . . for no reason." Paul R. testified the incident did not cause him to think defendant was the sort of person who could molest his daughter and actually had "the opposite" effect, because "it wasn't right. It wasn't normal. It wasn't normal."

On cross-examination, when asked how he would know what was normal behavior for a seven-year-old child who has been molested by her father, Paul R. responded, "I have two children of my own. I'd have an inkling."

Robert T. testified he has known defendant since 2009. Defendant has done odd jobs around the house for him, and he considers defendant a friend. He has socialized with defendant, K., and R. together. Defendant and R. have spent the night together at his place. His wife, Kathleen T., would also socialize with him, defendant, K., and R.

Robert T. testified that defendant is a good guy. He testified that defendant and R. would interact the way you would expect a father and daughter to interact. They would color together and play like a father and daughter. R. would run and jump on defendant's

8

lap and he would tickle her. He testified that R. never was afraid of or reluctant to be around defendant, and R. never told Robert that defendant did something bad to her.

Kathleen T. also testified for the defense. She also met defendant in 2009. She would see him several times a month and sometimes he would bring R. with him. She has seen defendant and R. interact many times over the years. She testified that R. would interact with defendant like a typical child with her dad. R. would be happy to be with defendant, would crawl on defendant and hug him, and R. would take defendant's hand while asking him to go with her to see Kathleen's horses. R. would color and show defendant, and defendant would comment on it.

Kathleen testified that R. never seemed afraid of defendant or reluctant to be around him. Before defendant went to jail, R. never said anything to Kathleen that would make Kathleen feel concerned about R.'s safety or welfare. Before defendant went to jail, R. never said anything about defendant doing something bad to her. Kathleen believes she and R. had a close enough relationship that R. would have told Kathleen if defendant was doing something bad to R.

Kathleen testified that after defendant was put in jail K. and R. went to visit Kathleen. K. told Kathleen that R. wanted to speak with her. When Kathleen and R. were alone, R. told Kathleen things Kathleen did not believe. R. said defendant had taken her to a shed and tied her up. R. told Kathleen defendant had told R. that grownups like to be with little kids. Kathleen told R. she did not believe her. Kathleen thought someone had told R. what to say, because she was speaking like an adult instead of a child—e.g., the nature of the allegations R. was making were sexual, but she did not use age appropriate language like "pee-pee" and "private spot" to the describe the acts. When asked by defense counsel, Kathleen testified R. was not crying, having trouble speaking, breathing fast, gasping for breath, or acting in an abnormal way physically when she spoke; but, R. was being a little quiet and sheepish.

9

Isabel D. has known defendant for over 25 years. She also knows K. She described defendant as a "dumbass" with a "horrible temper," who would sometimes get violent. Still, she trusted defendant with her own sons and would sometimes leave them alone with him. She knows R. too. Based on what she knows about defendant, she does not think he would commit the crimes that were alleged in this case. She would believe it if someone said he had been violent towards R., but not that he would have done something sexual.

Isabel D. testified that K. hates defendant and would destroy him anyway she could. K. got very angry with defendant when he killed one of their dogs, and she is angry that defendant is bisexual. She described K. as a spiteful person. Given what Isabel D. knows about K.'s character, Isabel D. believes she would falsify allegations about defendant sexually abusing their daughter. She believes K. would coach or prompt R. to make an allegation.

### CSAAS Testimony

Prior to trial, the People brought a motion in limine to include expert testimony on CSAAS. In his motions in limine, defendant sought to exclude expert CSAAS testimony under Evidence Code section 352, or to at least limit the use of CSAAS testimony to the People's rebuttal. At the hearing on the motions in limine, the trial court said it would allow testimony on CSAAS theory, but stated the expert could not opine as to whether abuse occurred in this case.

During trial, the People called Dr. Blake Carmichael. Due to scheduling issues, he testified after VonRader, Paul R., and Robert and Kathleen T., but as part of the People's case in chief.

Dr. Carmichael is a clinical psychologist who works at the Child and Adolescent Abuse Resource and Evaluation, Diagnostic and Treatment Center at the University of California at Davis Children's Hospital. He has directly treated 100 to 110 children who

have been sexually abused and has supervised another 200 or 300 sexual abuse cases. As a result of his work, he has become familiar with the concept of CSAAS. He knew nothing about the facts of this case when he testified. The trial court found him qualified as an expert in CSAAS.

Dr. Carmichael described the origins of CSAAS theory. It was developed in an article published in 1983 by Roland Summit in order to educate people about children who have been sexually abused. Dr. Carmichael testified that in 1983, and still today, there were a number of myths and misconceptions about children who had been sexually abused, which caused people to have expectations about the things a child molestation victim should or should not do.

But, he testified, kids who have been sexually abused will act in a variety of ways, and there is no one way to tell if they have been abused. One myth he noted is that people seem to think kids should say "no" or run and tell someone, or bite, kick, or scream to ward off their abusers, but the "vast majority of kids just can't tell quickly," and victims may take years to talk about the abuse.

Another myth is that when a child is abused, people should be able to tell because of a change in the child's behavior. Another myth is that there are certain personality profiles for abusers and abuse victims. Yet another myth is that abusers are typically strangers. He testified that children who have been abused do not automatically or uniformly appear disturbed; they have other things going on in their life and may even enjoy spending time with their perpetrator in a way that makes everything seem normal. When asked if a child might say someone called 911 when, in fact, no one had, Dr. Carmichael said that might happen when a victim wishes they or someone else had done something to stop the abuse. Children might love their perpetrators and feel guilty once they tell on them because that person will get in trouble.

Dr. Carmichael described CSAAS as having five components. The first three are secrecy, helplessness, entrapment or accommodation—which he thinks of more as coping

11

with how to deal with the abuse. The fourth component is making delayed, unconvincing, and conflicting disclosures. The fifth is recanting or retracting.

Secrecy involves the perpetrator establishing and maintaining secrecy. This can involve grooming a victim so the abuse becomes a normal part of the relationship, or threatening to do something bad if the victim discloses the abuse—including possible threats to kill the child's mom or dog—causing the child to become fearful of the consequences if he or she tells someone about the abuse.

Helplessness involves a bigger, stronger, and more sophisticated perpetrator abusing a vulnerable child victim. This contributes to it being unlikely that you will see a victim kick, bite, or scream to ward off their perpetrator.

Entrapment and accommodation factors into how children cope with the abuse. Children will do ineffective things to avoid the perpetrator. They will also disassociate during the acts of abuse. This makes it harder for them to recall some of the details of the abuse. Children might not show outward displays of anger or sadness when discussing the abuse.

The delayed disclosure component refers to the fact that most victims do not disclose within a week or two, many do not tell within a year, and many will not tell before they turn 18. Additionally, children will often be inconsistent in the way they talk about the abuse. It is also not atypical for victims to make incremental disclosures and not divulge everything all at once. He observed that dates will often blend together and overlap, and kids are not always good at remembering dates and sequences in general.

With retraction, a minority of victims will decide talking about abuse did not help them, and they don't want to deal with the consequences of telling; so, they will not talk about it anymore.

Dr. Carmichael testified that not all five CSAAS components will always be present in a child sexual abuse victim. The factors exist as a framework to understand why something happens in a way you would not expect. It is not a checklist.

12

The bottom line is not all victims will react the same way.

*Sentencing on Count One*

At the sentencing hearing, in imposing an upper term sentence of eight years for count one, the trial court stated, "the real issue is whether or not the mitigated, middle, or upper term should be imposed for that." The trial court then considered aggravating and mitigating factors identified in California Rules of Court, rules 4.421 and 4.423.

The factors in aggravation the trial court identified included that the crime was one of great violence and seriousness (Cal. Rules of Court, rule 4.421(a)(1)), threats made to the victim (Cal. Rules of Court, rule 4.421(a)(6)), the particular vulnerability of the victim (Cal. Rules of Court, rule 4.421(a)(3)), that the commission of the crimes involved defendant violating a position of trust (Cal. Rules of Court, rule 4.421(a)(11)), the serious and increasing nature of defendant's conduct (Cal. Rules of Court, rule 4.421(b)(1)), and that defendant was on probation at the time the crimes occurred (Cal. Rules of Court, rule 4.421(b)(4)). The trial court did not identify any mitigating factors on the record, and stated "even something akin to remorse that I could consider as a mitigating factor seems to be absent here."

The trial court then concluded, based on its consideration of aggravating factors and potential mitigating factors, "in terms of me exercising my discretion between aggravated or mitigated terms, the aggravating factors, in my opinion, far outweigh what, if any, mitigating factors there are. [¶] And so for [c]ount [one], a violation of [section] 288[, subdivision ](a), it is the judgment and sentence of this court that the upper term of eight years be imposed in the Department of Corrections."

DISCUSSION

I

*The CSAAS Evidence Was Properly Admitted*

Defendant makes two arguments that the trial court violated his Sixth and Fourteenth Amendment Rights when it admitted CSAAS testimony.

The first argument is that CSAAS evidence is not sufficiently reliable to be admissible under the *Kelly* rule as established in *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*).

This rule was formerly known as the *Kelly-Frye* rule, based on the rulings of *Kelly, supra,* 17 Cal.3d 24 and *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013 (*Frye*), but is now known as the *Kelly* rule in California after changes to the Federal Rules of Evidence that superseded *Frye*. (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 173, fn. 2 (*Lapenias*); *People v. Nieves* (2021) 11 Cal.5th 404, 442, fn. 8; *People v. Bolden* (2002) 29 Cal.4th 515, 545.)

Defendant argues existing jurisprudence allowing the admission of CSAAS evidence to help counter misconceptions jurors may have about how a child victim of sexual molestation should react must be reconsidered and abandoned. His second argument is that this jury specifically did not have—and jurors in general should no longer have—misconceptions about how victims of childhood sexual abuse should be expected to respond which must be corrected with CSAAS expert testimony.

Thus, defendant reasons, the CSAAS expert testimony admitted in this action was not a proper subject for expert testimony under Evidence Code section 801. We disagree with both arguments.

A. *California Jurisprudence Regarding the Admissibility of Syndrome and CSAAS Evidence*

In order to best contextualize defendant's arguments regarding whether CSAAS evidence should be admissible either in general or on this record, it is useful to briefly examine the history of California jurisprudence on the use of CSAAS and similar syndrome evidence.

In *People v. Bledsoe* (1984) 36 Cal.3d 236, 238 (*Bledsoe*), our Supreme Court considered when expert testimony on rape trauma syndrome might be admissible in a rape prosecution. In *Bledsoe*, at trial, "the prosecution introduced the rape trauma syndrome testimony, not to rebut misconceptions about the presumed behavior of rape victims, but rather as a means of proving—from the alleged victim's post-incident trauma—that a rape in the legal sense had, in fact, occurred." (*Id.* at p. 248.) The defendant argued that rape trauma syndrome evidence did not satisfy the test for admissibility of new scientific methods of proof as articulated in *Frye, supra,* 293 F. at page 1014, and applied in California courts pursuant to *Kelly*, *supra*, 17 Cal.3d at pages 30-32, which articulates a framework for determining the reliability of new scientific techniques offered during expert testimony. The Court observed, "[i]n a number of the cases in which the issue has arisen, the alleged rapist has suggested to the jury that some conduct of the victim after the incident—for example, a delay in reporting the sexual assault—is inconsistent with her claim of having been raped, and evidence on rape trauma syndrome has been introduced to rebut such an inference by providing the jury with recent findings of professional research on the subject of a victim's reaction to sexual assault." (*Bledsoe*, *supra*, 36 Cal.3d at p. 247.)

The Court also considered the purpose for which rape trauma syndrome theory was developed as compared to scientific methods typically "evaluated against the *Frye* standard of reliability." (*Bledsoe*, *supra*, 36 Cal.3d at p. 249.) The Court noted that, "[u]nlike fingerprints, blood tests, lie detector tests, voiceprints or the battered child

syndrome, rape trauma syndrome was not devised to determine the 'truth' or 'accuracy' of a particular past event—i.e., whether, in fact, a rape in the legal sense occurred—but rather was developed by professional rape counselors as a therapeutic tool, to help identify, predict and treat emotional problems experienced by the counselors' clients or patients. As the professional literature makes clear—and as the expert testimony in this case also reveals—because in the past women who have brought charges of rape have traditionally had their credibility or motives questioned by the police and others, rape counselors are taught to make a conscious effort to avoid judging the credibility of their clients." (*Id.* at pp. 249-250.)

The Court concluded, "[g]iven the history, purpose and nature of the rape trauma syndrome concept, we conclude that expert testimony that a complaining witness suffers from rape trauma syndrome is not admissible to prove that the witness was raped." (*Bledsoe*, *supra*, 36 Cal.3d at p. 251.)

After the Court issued its decision in *Bledsoe*, our courts of appeal considered its application to CSAAS evidence. In *People v. Roscoe* (1985) 168 Cal.App.3d 1093, 1099-1101, the Fifth District Court of Appeal applied the *Bledsoe* analysis to find that while expert testimony on the behavior of child molestation victims would be admissible for rebuttal purposes, "such as . . . testimony based on general literature or experience as to the reluctance of molest victims, as a class, to talk to investigators" (*Roscoe*, at pp. 1100-1101), testimony diagnosing a specific alleged victim as a molestation victim would not be admissible, because that diagnosis would imply that the molestation actually occurred.

In *People v. Gray* (1986) 187 Cal.App.3d 213, 215, 218 the appellant contended that the trial court erred when it did not apply the *Kelly* test and allowed the admission of CSAAS evidence. The Second District Court of Appeal disagreed, reasoning that the evidence was neither introduced to nor purported to prove that the molestation had occurred. (*Gray*, at p. 219.) Rather, it was used as rebuttal evidence that described the

reluctance of molestation victims as a class to speak with investigators. (*Ibid.*) The court explained that while it makes sense that *Bledsoe* subjected rape trauma syndrome evidence to the *Kelly* test when offered to prove that an alleged rape had, in fact occurred, the same could not be said of CSAAS evidence that is being offered to explain the reluctance of molestation victims as a class to talk to investigators when used in rebuttal. (*Gray,* at p. 219.)

In *People v. Bowker* (1988) 203 Cal.App.3d 385, 391 (*Bowker*), the Fourth District Court of Appeal noted that in *Bledsoe*, the Supreme Court applied the *Kelly* rule to exclude expert testimony that the complaining witness was suffering from rape trauma syndrome—i.e., expert testimony that the complaining witnesses behavior was the result of being raped. The appellate court also noted that the Court "in *Bledsoe* suggested that even though rape trauma syndrome failed the *Kelly-Frye* test, evidence related to the syndrome could be admissible to '[disabuse] the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths.' ([*Bledsoe*, *supra*,] 36 Cal.3d at pp. 247-248.)" (*Bowker*, at p. 391.) The Fourth District Court of Appeal then applied the *Bledsoe* rule— and the "exception" it articulated—to find that CSAAS evidence is admissible only for the purpose of showing that a victim's reactions are not inconsistent with having been molested. (*Bowker*, at pp. 393 & 394.)

Our Supreme Court first discussed the use of CSAAS evidence in a majority opinion in *People v. McAlpin* (1991) 53 Cal.3d 1289 (*McAlpin*). In *McAlpin*, the court considered the admissibility of expert testimony that "it is not unusual for a parent to refrain from reporting a known molestation of his or her child." (*Id.* at p. 1300.) In the trial court, the prosecutor had sought to introduce the evidence to "rehabilitate the corroborating testimony of" the victim's mother. (*Id.* at p. 1301.) The Court concluded that the proposed "evidence was clearly relevant [citation] because it tended to rehabilitate the testimony of [the mother] as a corroborating witness. It follows that the

17

trial court did not abuse its discretion in admitting the challenged testimony." (*Id.* at p. 1302, fn. omitted.)

In reaching this holding, the court considered the accepted use of rape trauma syndrome evidence (as articulated in *Bledsoe*) and CSAAS evidence (as articulated in appellate court decisions applying *Bledsoe*) to rehabilitate the testimony of, respectively, rape and child sexual abuse victims. (*McAlpin, supra,* 53 Cal.3d at pp. 1300-1301.) In so doing, the Court wrote, "[a]n even more direct analogy" than rape trauma syndrome to evidence regarding the reactions of victims' parents "may be drawn to expert testimony on common stress reactions of children who have been sexually molested ('child sexual abuse accommodation syndrome'), which also may include the child's failure to report, or delay in reporting, the abuse. In a series of decisions the Courts of Appeal have extended to this context both the rule and the exception of *People v. Bledsoe*, *supra*, 36 Cal.3d 236: i.e., expert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation. (*People v. Bowker*[*, supra*] 203 Cal.App.3d [at pp.] 390-394; *People v. Gray*[*, supra,*] 187 Cal.App.3d [at pp.] 217-220; *People v. Roscoe*[*, supra,*] 168 Cal.App.3d [at pp.] 1097-1100.) 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior. [para.] The great majority of courts approve such expert rebuttal testimony.' (Myers et al., *Expert Testimony in Child Sexual Abuse Litigation* (1989) 68 Neb. L.Rev. 1, 89, fn. omitted[].)" (*McAlpin*, *supra*, 53 Cal.3d at pp. 1300-1301.)

Thus, in *McAlpin*, the Court signaled its approval of opinions by our courts of appeal that would not allow the admission of CSAAS evidence to prove that the

18

complaining witness had, in fact, been sexually abused, but that would allow the admission of CSAAS evidence to rehabilitate a complaining witness's credibility when there is a suggestion that the witness's conduct after the incident is inconsistent with his or her claim of abuse. (*McAlpin, supra,* 53 Cal.3d at p. 1300.)

In *People v. Humphrey* (1996) 13 Cal.4th 1073, 1088, and *People v. Brown* (2004) 33 Cal.4th 892, 896, 905-907, our Supreme Court relied, in part, on the aforementioned analysis in *McAlpin*, to conclude that expert testimony about possible behavior of domestic violence victims could be used to assist the trier of fact in evaluating the victim's credibility, by dispelling misconceptions about battered women and/or explaining why trial testimony by an alleged domestic violence victim might be inconsistent with what she previously told police.

Since the Court issued its decision in *McAlpin*, each of our state's appellate court districts has cited it as authority for the rule that CSAAS evidence is not admissible to prove alleged sexual abuse occurred, but trial courts may admit CSAAS evidence to disabuse jurors of misconceptions they might have about how a child reacts to molestation. (See, e.g., *People v. Wells* (2004) 118 Cal.App.4th 179, 188 [1st Dist.Ct.App.] (*Wells*); *People v. Munch* (2020) 52 Cal.App.5th 464, 468 [2d Dist.Ct.App.] (*Munch*); *People v. Sandoval* (2008) 164 Cal.App.4th 994, 1001-1002 [3d Dist.Ct.App.]; *Lapenias, supra,* 67 Cal.App.5th at p. 171 [4th Dist.Ct.App.]; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744 [5th Dist.Ct.App.] (*Patino*); *People v. Perez* (2010) 182 Cal.App.4th 231, 245 [6th Dist.Ct.App.].) California courts now allow the admission of CSAAS evidence not only in rebuttal cases, but also in "the prosecution's case-in-chief" when "an issue has been raised as to the victim's credibility. [Citations.]" (*Patino*, at p. 1745.)

B.   *The* Kelly *Rule Does Not Bar the Admission of CSAAS Evidence*

In his first argument, defendant takes the position that CSAAS testimony as used here should be inadmissible under the *Kelly* rule because it is "junk science." Defendant's argument is inconsistent with California jurisprudence on CSAAS evidence and misapplies the *Kelly* rule.

The *Kelly* rule "conditions the admissibility of evidence based on a new scientific method of proof on a showing that the technique has been generally accepted as reliable in the scientific community in which it developed." (*People v. Shirley* (1982) 31 Cal.3d 18, 34; see also *Lapenias, supra,* 67 Cal.App.5th at p. 173.) It applies "only to expert testimony 'based, in whole or part, on a technique, process, or theory which is new to science and, even more so, the law.' (*People v. Stoll* (1989) 49 Cal.3d 1136, 1156.)" (*Lapenias*, *supra*, 67 Cal.App.5th at p. 173.) Additionally, the rule only applies if "the unproven technique or procedure appears in both name and description to provide some definitive truth which the expert need only accurately recognize and relay to the jury. The most obvious examples are machines or procedures which analyze physical data." (*Stoll,* at p. 1156; see also *Lapenias*, *supra*, 67 Cal.App.5th at p. 173.) Under these principles, as discussed above, CSAAS evidence is subject to exclusion under *Kelly* when offered " 'to prove that a molestation actually occurred,' " which is not why it was admitted here. (See *Wells, supra,* 118 Cal.App.4th at p. 188, quoting *Patino*, *supra*, 26 Cal.App.4th at p. 1744.)

"Here, the theory of CSAAS is not new" to science or the law. (*Lapenias*, *supra*, 67 Cal.App.5th at p. 173.) The CSAAS evidence appellant challenges "has been ruled to be properly admitted by the courts of this state for decades." (*Munch, supra,* 52 Cal.App.5th at p. 472; see also *McAlpin, supra,* 53 Cal.3d at pp. 1300-1301; *Lapenias*, at p. 173; *Bowker, supra,* 203 Cal.App.3d at p. 389, fn. 3 [CSAAS dates back to at least

1983].)  Plainly, CSAAS does not fall into the first category of evidence—new scientific methods—to which *Kelly* applies.

Second, California courts have strictly limited admission of CSAAS evidence (and analogous models such as battered person's syndrome and rape trauma syndrome) to disabusing a jury of commonly held misconceptions about how a child reacts to a molestation, " 'and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*McAlpin*, *supra*, 53 Cal.3d at p. 1301; see also *People v. Humphrey, supra,* 13 Cal.4th at p. 1088; *Lapenias*, *supra*, 67 Cal.App.5th at p. 171.) Thus, while "expert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused[,] it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*McAlpin*, *supra*, 53 Cal.3d at p. 1300; see also *Munch*, *supra*, 52 Cal.App.5th at pp. 466, 468; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 82 [psychological expert may not testify about rape trauma syndrome in order to prove that a rape actually occurred, but "such testimony is admissible to rehabilitate the credibility of the complaining witness against a suggestion that her behavior after the assault—such as a delay in reporting it—was inconsistent with her claim of having been raped"]; *Bledsoe, supra,* 36 Cal.3d at pp. 247-248, 251.)

As limited by California courts, expert testimony based on CSAAS does not purport to provide a definitive truth, but "is 'based on [the expert's] clinical experience with child sexual abuse victims and on [his or] her familiarity with professional literature in the area.' " (*Munch*, *supra*, 52 Cal.App.5th at p. 473, quoting *People v. Harlan* (1990) 222 Cal.App.3d 439, 449.)  This testimony meets "traditional standards for competent expert opinion, without need for additional screening procedures [under *Kelly*]" (*People v. Stoll*, *supra*, 49 Cal.3d at p. 1161), and is therefore not subject to the *Kelly* rule

(*Munch*, at p. 473; *Lapenias*, *supra*, 67 Cal.App.5th at p. 173; *Harlan*, at p. 449 ["The [*Kelly*] rule does not apply to [CSAAS] evidence"]).

Defendant makes four arguments in an effort to convince this court to part with California jurisprudence that finds CSAAS testimony admissible for the purposes it was used here. First, citing academic articles and decisions of other states and the federal Second Circuit Court of Appeals, defendant argues that CSAAS testimony ought to be more severely restricted or banned entirely because it "is not reliable enough to be used in criminal prosecutions." We decline defendant's invitation to reconsider California precedents based on decisions reached in other jurisdictions.

To begin with, in response to similar arguments, the Court of Appeal for the Second District, in *Munch*, *supra*, 52 Cal.App.5th at pages 469-471, took a close look at many of the citations defendant relies upon in his brief, and found that they either no longer represent the prevailing law in the subject jurisdictions or are otherwise unpersuasive. Indeed, *Munch* concluded that "the vast majority of jurisdictions and many of the jurisdictions Munch highlights have rendered decisions that are consistent with *McAlpin*." (*Id.* at p. 472.) Also, authority from other states is not controlling. (*People v. Williams* (1997) 16 Cal.4th 153, 195.)

The law is well-settled in California that CSAAS evidence is admissible for the purposes for which it was admitted here. (*McAlpin*, *supra*, 53 Cal.3d at p. 1301; *Wells, supra,* 118 Cal.App.4th at p. 188; *People v. Gray, supra,* 187 Cal.App.3d at pp. 218-220.) We are bound by precedent from our Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455; see *People v. Perez, supra,* 182 Cal.App.4th at p. 245 [reasoning of *McAlpin*, *supra*, 53 Cal.3d 1289 and *People v. Brown*, *supra*, 33 Cal.4th 892 regarding admissibility of CSAAS testimony binding on Courts of Appeal].)

Second, defendant argues that even though California courts have allowed the consideration of CSAAS to dispel misconceptions about victim reactions and reporting,

22

the California Supreme Court has never squarely found that CSAAS evidence is admissible under the *Kelly* test in such cases. Instead, he argues, California courts have consistently relied on "dictum" in two California Supreme Court decisions—*McAlpin, supra,* 53 Cal.3d at pages 1300-1301 and *People v. Brown, supra,* 33 Cal.4th at pages 906-907—to find CSAAS evidence admissible, and that we ought to consider the evidence by applying the *Kelly* rule anew and then stop allowing the use of CSAAS evidence.

But "[d]icta of our Supreme Court are highly persuasive." (*People v. Wade* (1996) 48 Cal.App.4th 460, 467.) "When the Supreme Court has conducted a thorough analysis of the issues and such analysis reflects compelling logic, its dictum should be followed." (*Hubbard v. Superior Court* (1997) 66 Cal.App.4th 1163, 1169.) As such, " 'we will not reject dicta of the Supreme Court without a compelling reason.' (*Howard Jarvis Taxpayers Assn. v. City of Fresno* (2005) 127 Cal.App.4th 914, 925.)" (*Benton v. Benton* (2019) 39 Cal.App.5th 212, 218.) We find no compelling reason here.

Third, defendant argues that this court and other courts of appeal have previously applied the *Kelly* rule to bar the use of CSAAS evidence in dependency hearings, suggesting the same reasoning should bar its use here. However, in two of the four dependency cases defendant cites, CSAAS evidence was being offered to prove a child had, in fact, been sexually abused. (See *In re Sara M.* (1987) 194 Cal.App.3d 585, 592; *Seering v. Dep't of Social Services* (1987) 194 Cal.App.3d 298, 306 ["The Seerings contend that Dr. Corwin was improperly permitted to give his opinion that the Seerings were the molesters and that he was improperly permitted to testify that in his opinion [the victim] had been molested because he viewed her behavior as consistent with the 'child sexual abuse accommodation syndrome' (CSAAS)"]). In the other two cases the admissibility of CSAAS evidence under *Kelly* was not at issue at all (*In re Amber B.* (1987) 191 Cal.App.3d 682, 690, fn. 3 ["This case, therefore, does not present the issue whether the theory of child sexual abuse accommodation syndrome is subject to *Kelly-*

23

*Frye*"]; *In re Christine C.* (1987) 191 Cal.App.3d 676, 679, fn. 2 ["The expert witnesses occasionally described behavior by Christine and Michael which appears similar to some of the elements of 'child sexual abuse accommodation syndrome' [citation] but none of the witnesses asserted this theory or described its elements"]).

Fourth, defendant claims that *Bowker, supra,* 203 Cal.App.3d 385 and cases following it—which would include *McAlpin*, *supra*, 53 Cal.3d at page 1301—ignores that in *Bledsoe* the Supreme Court recognized that "even when syndrome evidence is offered for a limited purpose, it must still be generally accepted by the scientific community under *Kelly*[]."

That is, defendant suggests that *McAlpin's* findings regarding CSAAS evidence, which courts in this state have relied on for many years now, are based on a decision (*Bowker*) that in turn misread the Supreme Court's *Bledsoe* findings regarding when syndrome evidence is admissible and when the *Kelly* rule applies to keep it out. *Bledsoe* does not require the *Kelly* test to be applied when determining if rape trauma syndrome evidence is admissible to disabuse jurors of misconceptions they might have regarding how rape victims should behave. Moreover, we are not inclined to conclude that our Supreme Court hastily adopted findings of an appellate court without an understanding of the nature and import of the reasoning the appellate court used to support those findings.

C.    *Admissibility Under Evidence Code Section 801*

In his second argument, defendant says that, in light of increased awareness surrounding sexual assault due to the #MeToo movement and statements made by potential jurors during voir dire, CSAAS was not a proper subject for expert testimony under Evidence Code sections 801 and 352.

This argument carries no weight.

"California law permits a person with 'special knowledge, skill, experience, training, or education' in a particular field to qualify as an expert witness (Evid. Code,

§ 720), and to give testimony in the form of an opinion (Evid. Code, § 801)." (*People v. Ewing* (2016) 244 Cal.App.4th 359, 381.) A testifying expert may "express an opinion on 'a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' (Evid. Code, § 801, subd. (a).) In addition to matters within their own personal knowledge, experts may relate information acquired through their training and experience, even though that information may have been derived from conversations with others, lectures, study of learned treatises, etc." (*People v. Sanchez* (2016) 63 Cal.4th 665, 675.) " 'The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion.' (*People v. McDowell* (2012) 54 Cal.4th 395, 426.)" (*People v. Duong* (2020) 10 Cal.5th 36, 60; see also *Ewing,* at p. 381.) Similarly, Evidence Code section 352 allows a trial court, "in its discretion" to exclude "evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." The trial court's "exercise of discretion under Evidence Code section 352 will not be disturbed on appeal absent a clear abuse, i.e., unless the prejudicial effect of the evidence clearly outweighs its probative value." (*People v. Karis* (1988) 46 Cal.3d 612, 637.)

Defendant asks us to assume that, in light of the recent #MeToo movement and the resulting media attention and press, jurors no longer possess misconceptions about why child victims of sexual abuse might delay reporting abuse, recant stories of abuse, minimize that abuse, stay in contact with their abusers, or tell inconsistent stories about the abuse and, therefore, the use and probative value of expert CSAAS testimony is now greatly diminished. We will not so assume.

As a preliminary matter, defendant cites no evidence or studies to support his claim that #MeToo has had a meaningful impact on public understanding of the reactions of victims of sexual abuse—whether adult victims or minor victims—such as to eliminate

misconceptions by jurors as to frequent reactions of those victims. Defendant offered no evidence at trial, and offers no supporting studies here, that find that lay jurors have somehow become aware enough of and have become sophisticated enough to know or appreciate the often apparent inexplicable actions of children who have been sexually abused, the #MeToo movement notwithstanding. In our view, child sexual abuse and the reactions of its victims remains, fortunately, beyond the experience of many, if not most, lay jurors.

Turning his attention away from current media trends and to the record in this case, defendant argues that statements made by jurors (or their silence) during voir dire demonstrate that in this specific case there was no evidence that the jurors retained the sort of misconceptions CSAAS expert testimony is used to correct. He points to answers in which jurors admitted that they themselves or people they were related to had been victims of sexual abuse, to jurors not raising their hands when the prosecutor asked if they would expect child abuse victims to report immediately or fight back, and to jurors implying by their silence during defense counsel questioning that they would keep an open mind when asked if they would expect an abuse victim to avoid her abuser.

But, to begin with, that jurors or their family members have suffered abuse does not lead to a conclusion that those jurors understand the varying reactions to abuse which CSAAS expert testimony can offer to explain. If anything, absent CSAAS testimony, there is a risk that a juror might have decided R. was not credible because she did not react to her abuse the same way the juror or their family member reacted to sexual abuse.

In addition, juror silence in response to group questioning hardly gives rise to a certain conclusion that they have a full understanding about how a child victim will react to sexual abuse. Defendant's own witnesses testified they did not believe R. when she told them she had been abused, demonstrating the value of allowing an expert to testify about how people expect victims of sexual abuse to react and behave.

26

D.    *Defendant's Constitutional Rights Were Not Violated*

"The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair." (*People v. Falsetta* (1999) 21 Cal.4th 903, 913.) As indicated above, we find that CSAAS evidence retains its value as a means of dispelling misconceptions about how child victims of sexual abuse should react both in general and as they might have in this case. It is well-settled that "introduction of CSAAS testimony does not by itself deny appellant due process." (*Patino, supra,* 26 Cal.App.4th at p. 1747.) Where, as here, CSAAS evidence is used to explain behavior of a victim whose credibility has been questioned—e.g., because she did not tell a trusted family friend about her abuse, because she behaved normally around her father, or because she said her mother had called 911 to protect her when her mother made no such calls—there is no due process violation. (See *id.* at pp. 1744-1745, 1747; *McAlpin*, *supra*, 53 Cal.3d at pp. 1300-1302.) We therefore reject defendant's claim that admission of the CSAAS evidence violated his constitutional rights.

II

*Instruction Regarding CSAAS Testimony*

Defendant argues that CALCRIM No. 1193 allows jurors to use CSAAS evidence as substantive evidence of a defendant's guilt. Defendant reasons that because the instruction allows jurors to consider CSAAS evidence in evaluating the believability of victim witnesses, it functionally contributes to a finding that the complaining witness's allegations of sexual abuse are true.

Defendant also argues that the instruction lowered the prosecution's burden of proof, depriving him of due process. In reply to the People's argument that defendant forfeited any argument he has regarding this instruction by not objecting to it below, defendant argues that his substantial rights have been affected by the purported problems

27

with the instruction. Even assuming defendant did not forfeit his right to raise this issue on appeal, his argument fails.

We apply a de novo standard of review to claims of jury instructional error. (*People v. Fiore* (2014) 227 Cal.App.4th 1362, 1378.) "[T]he proper test for judging the adequacy of instructions is to decide whether the jury was fully and fairly instructed on the applicable law." (*People v. Partlow* (1978) 84 Cal.App.3d 540, 558.)

CSAAS evidence "is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*McAlpin*, *supra*, 53 Cal.3d at p. 1300; *id*. at pp. 1300-1301.)

Here, the trial court slightly modified the Judicial Council's recommended instruction (CALCRIM No. 1193) to conform to the actual CSAAS testimony in this case: "You have heard testimony from Dr. Carmichael regarding Child Sex Abuse Accommodation Syndrome. Dr. Carmichael's testimony about Child Sex Abuse Accommodation Syndrome is not evidence that the Defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not R.[]'s conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony." (See Cal. Rules of Court, rule 2.1050(a).)

Courts have held this pattern jury instruction accurately informs the jury on the limited use of CSAAS evidence, but the instruction does not: (a) improperly allow an alleged minor victim of sexual abuse to corroborate her own testimony; (b) violate due process; or (c) misapply the burden of proof. (*People v. Gonzales* (2017) 16 Cal.App.5th 494, 503-504; accord, *Munch, supra,* 52 Cal.App.5th at pp. 473-474; *Lapenias, supra,* 67 Cal.App.5th at pp. 175-176.)

28

We agree with *People v. Gonzales*, *supra*, 16 Cal.App.5th at pages 503-504; *Munch*, *supra*, 52 Cal.App.5th at pages 473-474; and *Lapenias, supra,* 67 Cal.App.5th at pages 175-176. We also hold CALCRIM No. 1193 accurately instructs the jury on the law including the proper use and the proper limitations on the use of CSAAS evidence. Thus, we find the trial court did not commit error by instructing the jury with CALCRIM No. 1193.

III

*Resentencing Under Senate Bill No. 567*

While defendant's appeal was pending, the Legislature enacted Senate Bill No. 567 (2021-2022 Reg. Sess.) (Senate Bill 567), which took effect on January 1, 2022. Among other things, the bill amended section 1170, subdivision (b) to prohibit trial courts from considering aggravating circumstances to justify an upper term sentence, unless the facts underlying each aggravating factor have been established by one of three prescribed methods. (Stats. 2021, ch. 731, § 1.3.) As amended, section 1170, subdivision (b) provides that aggravating circumstances only justify the imposition of an upper term sentence if (1) "the facts underlying those circumstances have been stipulated to by the defendant, or [(2)] have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2), as amended by Stats. 2021, ch. 731, § 1.3.), or (3)the court may "consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury." (§ 1170, subd. (b)(3).)

Defendant correctly argues and the People correctly concede that the amended version of section 1170, subdivision (b) applies retroactively in this case as an ameliorative change in the law applicable to all nonfinal convictions on appeal. (See *In re Estrada* (1965) 63 Cal.2d 740, 745; *People v. Conley* (2016) 63 Cal.4th 646, 657 ["in the absence of contrary indications, a legislative body ordinarily intends for ameliorative

29

changes to the criminal law to extend as broadly as possible"]; *People v. Flores* (2022) 73 Cal.App.5th 1032, 1039 [holding Senate Bill 567 applies retroactively to nonfinal convictions on appeal].)

Defendant contends and the People agree that these amendments to section 1170, subdivision (b) require reversal of defendant's sentence and remand for resentencing because the trial court based the upper term sentence for count one on aggravating factors that do not satisfy the amended statute's threshold requirements for consideration. Specifically, defendant notes he did not stipulate to any of the aggravating circumstances the trial court considered in selecting an upper term sentence, and a jury did not find true the aggravating factors considered by the judge in imposing the upper term. And the court did not find the defendant had prior convictions based on a certified record of conviction.

The parties agree that remand for resentencing consistent with the amendments to section 1170, subdivision (b), is the proper remedy for addressing the sentence imposed for count one.

We will remand for a full resentencing. (See *People v. Buycks* (2018) 5 Cal.5th 857, 893 ["when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances' "].) On remand, the trial court may revisit all of its sentencing choices in light of new legislation. (See *People v. Valenzuela* (2019) 7 Cal.5th 415, 424-425 ["the full resentencing rule allows a court to revisit all prior sentencing decisions when resentencing a defendant"].)

## DISPOSITION

The sentence is vacated and the matter is remanded for resentencing in compliance with section 1170 as amended by Senate Bill 567.  The judgment is otherwise affirmed.


                              _____

                              HULL, Acting P. J.

We concur:


_____

MAURO, J.


_____

DUARTE, J.